**JASON I. SER**
California State Bar No. 201816
FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
San Diego, California 92101-5008
Telephone: (619) 234-8467

Attorneys for Mr. Calderon-Quinonez

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE ROGER T. BENITEZ)**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>LUIS CALDERON-QUINONEZ,<br>Defendant. | Case No.: 07cr3408-BEN<br>Date: March 24, 2008<br>Time: 2:00 p.m.<br>**STATEMENT OF FACTS AND POINTS AND AUTHORITIES IN SUPPORT OF MOTIONS** |

**I.**

**STATEMENT OF FACTS**[1]

On December 5, 2007, at approximately 12:26 p.m., Mr. Calderon-Quinonez drove a blue Chevrolet SUV with Mexican license plates to primary inspection lane number 9 at the Calexico West Port of Entry. He was the sole occupant. At primary, Mr. Calderon-Quinonez presented "his valid DSP-150," which is a B1/B2 visa, to United States Customs and Border Protection Officer ("CBPO") Alvarado. [2] During inspection, the computer generated a random referral of Mr. Calderon-Quinonez and the car for a routine compliance examination. Mr. Calderon-Quinonez, in response to inquiry, informed the primary inspector

[1] The following statement of facts is based on materials received from the government. The facts alleged in these motions are subject to elaboration and/or modification at the time these motions are heard. Mr. Calderon-Quinonez reserves the right to take a position contrary to the following statement of facts at the motions hearing and at trial.

[2] The quoted portions of the statement of facts are taken from government reports provided to the defense in discovery.

that he was not bringing anything from Mexico and that he was going to Calexico to shop at Las Palmas. The primary inspector, thereafter, told Mr. Calderon-Quinonez to drive his car into secondary inspection. Mr. Calderon-Quinonez said "no problem" and was fully compliant with the inspector.[3]

Upon arriving at the secondary inspection area, Mr. Calderon-Quinonez again provided his valid DSP-150. The secondary inspector, CBPO Rivera, obtained a second negative declaration from Mr. Calderon-Quinonez. In light of the nature of the random referral, she also summoned an agriculture specialist to take a separate agricultural declaration from Mr. Calderon-Quinonez.

It was at this time that CBPO Ledbetter, another officer who was working in secondary inspection, began to inspect the rear side of the vehicle. He was asked to do so by Canine Enforcement Officer ("CEO") Randolph, who also had been working in secondary. CEO Randolph's canine, Pina, had alerted to Mr. Calderon-Quinonez's vehicle prompting his request with CBPO Ledbetter.. During his inspection, CBPO Ledbetter removed the door molding and pulled the side wall paneling away. Upon doing so, he noticed gray duct tape on the inner wall. CBPO Ledbetter "then reached inside the inner wall and felt a[n] unnatural package." Immediately subsequent to his having felt inside the wall, CBPO walked directly to Mr. Calderon-Quinonez, who was nearby, "instructed the subject [Mr. Calderon-Quinonez] to come with [him] and placed him in an escort hold. [CBPO Ledbetter] escorted the subject to the VS [vehicle secondary] Office and conducted a patdown with prior approval from [a supervisor]." CBPO Ledbetter then left Mr. Calderon-Quinonez in the VS Office, in the presence of multiple officers, and returned to the vehicle.

Upon returning to the car, CBPO Ledbetter removed the right rear sidewall panel. He "probed a package and a white powdery substance was produced that field tested positive for Cocaine." Immigration and Customs Enforcement ("ICE") Special Agent Vensk, who was present, decided to set up a "cold convoy" and told CBPO Ledbetter not to continue to release Mr. Calderon-Quinonez. The "cold convoy" was approved by the District Field Office Director. At approximately 1:55 p.m., 100 minutes after CBPO Ledbetter began his inspection of the vehicle, took Mr. Calderon-Quinonez to the VS Office, and left him there, Mr. Calderon-Quinonez was finally allowed to leave the port.

---

[3] Nothing in the primary inspector's report indicates or even suggests Mr. Calderon-Quinonez appeared nervous or that the vehicle appeared out of the ordinary.

Upon leaving the port, Agent Vensk began to follow Mr. Calderon-Quinonez's car. Mr. Calderon-Quinonez's route took him north on Imperial Avenue and then east on Third Street. Mr. Calderon-Quinonez parked his car on Third Street, west of Rockwood Avenue. Mr. Calderon-Quinonez exited the car, walked to the sidewalk, allegedly yelled to somebody, and then talked on his cell phone. After returning to the car, he continued east on Third Street, then north on Heffernan Avenue, then west on Fourth Street, and then north on Imperial Avenue. At Fifth Street, Mr. Calderon-Quinonez made a u-turn and went south on Imperial Avenue.

At approximately 2:05 p.m., CBPO Ledbetter observed Mr. Calderon-Quinonez's vehicle driving south toward Mexico on Imperial Avenue. He "flagged the subject and vehicle down," "placed a stop stick under the left front tire and approached the vehicle's driver's door." After identifying himself, he told Mr. Calderon-Quinonez to step out of the vehicle. Mr. Calderon-Quinonez was subsequently taken to the VS Office. Officers again conducted a patdown.

CBPO Ledbetter returned to the vehicle and removed 14 packages from the right rear sidewall and 12 packages from the left rear sidewall. The net weight was 32.54 kilograms. Although discovery does not indicate whether any additional tests were conducted, CBPO Ledbetter's report indicated the substance was cocaine.

On December 19, 2007, the January 2007 Grand Jury panel issued an indictment charging Mr. Calderon-Quinonez with violating 21 U.S.C. §§ 952 and 960, importation of cocaine, and 21 U.S.C. § 841(a)(1), possession of cocaine with the intent to distribute. He pled not guilty to these charges.

## II.

## <u>THE COURT MUST SUPPRESS ALL EVIDENCE OBTAINED AS A RESULT OF THE UNCONSTITUTIONAL VEHICLE STOP BY CUSTOMS AS WELL AS THE FRUITS OF THAT EVIDENCE</u>

### A. The Vehicle Stop In This Case Violated The Fourth Amendment.[4]

In the context of investigatory stops, "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot . . . ." <u>United States v.</u>

---

[4] Although a passenger in the vehicle, the Supreme Court makes clear that Mr. Calderon-Quinonez has standing to challenge the lawfulness of the vehicle stop. <u>See</u> <u>Brendlin v. California</u>, 127 S.Ct. 2400, 2403 (2007).

Arvizu, 534 U.S. 266, 273 (2002) (internal quotations omitted). To sustain an officer's reasonable suspicion determination, this Court "must look at the 'totality of the circumstances' . . . to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." Id. Although an officer may rely upon "experience and specialized training to make inferences from and deductions about the cumulative information available" to him before he makes an investigatory stop, "an officer's reliance on a mere hunch is insufficient to justify [such] a stop . . . ." Id. at 273-274 (internal quotations omitted). Put another way, the officer's "experience and specialized training" alone does not fulfill the reasonable suspicion requirement: to make an investigatory stop the officer must have a "particularized and objective basis" founded in specific facts that he has observed that lead to the conclusion that "criminal activity may be afoot." Id.; accord United States v. Montero-Camargo, 208 F.3d 1122, 1131 (9th Cir. 2000) (en banc) ("an officer's experience may furnish the background against which the relevant facts are to be assessed as long as the inferences he draws are objectively reasonable; but 'experience' does not in itself serve as an independent factor in the reasonable suspicion analysis") (internal citations omitted); United States v. Diaz-Juarez, 299 F.3d 1138, 1141 (9th Cir. 2002) ("experience may not be used to give the officers unbridled discretion in making a stop" "an investigatory stop must be based on facts, not the mere subjective impressions of a particular officer") (internal citations and quotations omitted); United States v. Sigmond-Ballesteros, 285 F.3d 1117, 1121 (9th Cir. 2002) (same).

The Arvizu case demonstrates how a Border Patrol agent properly formed reasonable suspicion to perform an investigatory vehicle stop. In Arvizu, the agent articulated the following facts: (1) a magnetic sensor alerted the agent to the presence of a vehicle on an unpaved, seldom traveled road used by smugglers to avoid Border Patrol checkpoints, Arvizu, 534 U.S. at 268; (2) the sensor alert occurred during a change in shifts which would leave the area unpatrolled by the agents, id.; (3) the same sensor had detected a minivan using the same route several weeks before which resulted in a marijuana seizure, id. at 269-270; (4) a second sensor signal indicated to the agent that the vehicle had turned onto another unpaved road on a route commonly used to circumvent checkpoints, id. at 270; (5) when the agent intercepted the vehicle, it turned out to be a minivan, id.; (6) when the agent followed the minivan, he noted that the occupants, who appeared to be a family, behaved strangely, first ignoring him and then waving in a mechanical manner, id. at 270-271; (7) the agent could see the children's knees, which indicated that their feet rested on some cargo.

Id. at 270; (8) the van turned onto a third, even rougher unpaved road, away from any checkpoint, and away from any destination a family might want to reach for recreation, id. at 271; and, (9) a radio check by the agent indicated that the minivan was registered to an address four miles from the international border in a neighborhood notorious for smuggling activity. Id. at 271. As a result, the agent in Arvizu had reasonable suspicion to perform an investigatory stop of the minivan because he could:

> infer from his observations, his registration check, and his experience that . . . [the minivan] had set out . . . along a little-traveled route used by smugglers to avoid the . . . checkpoint[s] . . . at a time when officers would be leaving their . . . shifts . . . on unpaved and primitive roads.

Arvizu, 534 U.S. at 277.

A comparison between the facts of Arvizu and the facts that form the particularized and objective basis for suspecting legal wrongdoing in this case demonstrates that the ICE agents in this case had no reasonable suspicion to stop the vehicle driven by Mr. Calderon-Quinonez. In Arvizu, the agent had nine independent, particularized, and objective facts that, when coupled with his experience and specialized training, allowed him to draw inferences from and deductions about the situation he faced. See supra. Thus, the Supreme Court found that the agent in Arvizu had a reasonable suspicion that the occupant(s) of the van were engaged in criminal activity. In the case at bar, on the other hand, it is likely the government will fall back upon alleged observations of the vehicle which had arrived at the Calexico, California West port of entry into the United States. There, the vehicle arrived at lane 9, at approximately 12:30 p.m., at which time Mr. Calderon-Quinonez presented a valid visa. The primary inspector's report noted nothing unusual about Mr. Calderon-Quinonez, e.g., signs of nervousness, or the vehicle, e.g., riding low, smell, etc. Mr. Calderon-Quinonez answered all of the inspector's questions, and was entirely cooperative. In fact, the inspector allowed Mr. Calderon-Quinonez to drive his own vehicle to secondary. Thus, the car and its driver appeared consistent with all other legitimate traffic passing through the port at the lunch hour. Although sent to secondary, this was not based upon any suspicion on the part of the primary inspector. The vehicle was selected for a random agricultural referral. In secondary, inspectors' reports noted nothing unusual about Mr. Calderon-Quinonez, e.g., signs of nervousness. A subsequent pat-down of Mr. Calderon-Quinonez also proved negative. With regard to the vehicle, a narcotics detector dog allegedly alerted to the vehicle, CBPO Ledbetter observed "gray duct tape" in the area of the car's right rear quarter panel and allegedly "felt" what

he characterized as "a[n] unnatural package" after reaching into what appears to have been a standard factory space - not a specially constructed compartment. An alleged field test of the content of the supposed "package" purportedly identified the presence of cocaine. Nothing indicates that any inspectors performed a visual inspection of the "package" or the interior of the space containing the package at this time.

When viewed in their totality on the current record, these facts do not support reasonable suspicion. Thus, this Court has only the agents' past experience and specialized training: i.e., that cars passing through the port of entry may contain contraband. Nothing "more than an 'inchoate and unparticularized suspicion' or 'hunch' of criminal activity" cannot suffice. Illinois v. Wardlow, 528 U.S. 119, ----, 120 S.Ct. 673, 676 (2000). Furthermore, past experience and specialized training do not support reasonable suspicion as a matter of law. See discussion, supra. Moreover, even if this Court gives the agents' experience and specialized training more weight than it deserves, the mere presence of a truck at the port of entry, which is a high traffic area, in and of itself does not support reasonable suspicion either. See Illinois v. Wardlow, 528 U.S. at 124; Brown v. Texas, 443 U.S. 47, 52 (1979); Diaz-Juarez, 299 F.3d at 1142.

The agents also cannot rely upon any failure to yield given that the agents never activated their lights of siren to stop the truck driven by Mr. Calderon-Quinonez. The vehicle stopped when CBPO Ledbetter flagged Mr. Calderon-Quinonez down.[5] The agents also do not state in their reports that Mr. Calderon-Quinonez drove the vehicle in a reckless or evasive manner such as swerving out of his lane of traffic. Nothing in the reports provided by the government indicates or intimates that Mr. Calderon-Quinonez violated any traffic laws. His U-turn itself is insufficient given the absence of any checkpoints in the area. See United States v. Ogilvie, 527 F.2d 330, 332 (9th Cir.1975) His safe driving is simply not the sort of conduct that the Supreme Court has held is properly part of the reasonable suspicion calculus.

Accordingly, the Court should find that the agents did not have reasonable suspicion to perform an investigatory stop of the vehicle. Accordingly, the stop violated the Fourth Amendment.

[5] Although CBPO Ledbetter is assigned as an inspector at the Calexico West Port of Entry, Mr. Calderon-Quinonez does not concede that he was stopped in the southbound lanes at the port itself.

**B. The Government Must Prove the Reliability of the Narcotic Detector Dog as Well as Any Alleged Field Tests Used to Identify the Purported Substance Prior to the Stop.**

The defense anticipates that the government will likely rely upon the alert by the narcotic detector dog and alleged field tests for controlled substances conducted at the port of entry in this case to meet its burden of proving reasonable suspicion. In this case, the government has produced nothing regarding the dog's reliability or the reliability of the alleged field tests in question. This blank record is woefully short of the conclusory testimony of the canine handler that the Ninth Circuit found insufficient in United States v. Cedano-Arellano, 332 F.3d 568, 573 (9th Cir. 2003).

The Court in Cedano-Arellano held that in order to use a canine alert as a justification in the probable cause analysis, the government must prove the reliability of the canine that made the search. Cedano-Arellano, 332 F.3d at 573. As part of its burden of proof, the government was required to produce to the defense all training materials, including logs, score sheets, certification records, training standards, and training manuals, regarding the canine in question. Id. at 570-572. Indeed, the Ninth Circuit has explicitly held that such proof of reliability, and the related discovery obligations, on the part of the government "is mandatory." Id. at 573; accord United States v. Cortez-Rocha, 383 F.3d 1093, 1095 n.1 (9th Cir. 2004); United States v. Nava, 363 F.3d 942, 944 n.1 (9th Cir. 2004). The rationale of Cedano-Arellano is equally applicable to the field tests conducted on the contents of the "package" felt by CBPO Ledbetter and requires some showing of reliability at to the test in order to rely upon its results.

Since the government has failed to live up to its clear burdens of proof and production on either the dog or test, this Court has no facts before it other than that customs inspectors stopped and searched a vehicle based upon an alleged dog alert and supposed field test for a controlled substance that purportedly indicated the presence of cocaine. Certainly, such facts do not rise to reasonable suspicion to support the stop and search. The Court should suppress all evidence.

**C. The Government Bears the Burden of Establishing Application of the "Extended Border Search" Doctrine to Justify the Stop and Search in this Case.**

A search may be regarded as an "extended border search" where a vehicle is kept under surveillance from the time that it crosses and leaves the border. The Ninth Circuit's seminal case of United States v. Alexander, 362 F.2d 379 (9th Cir. 1966), identified the government's burden to demonstrate whether a stop and search constitutes an "extended border search."

> Where [] a search for contraband by Customs officers is not made at or in the immediate vicinity of the point of international border crossing, the legality of the search must be tested by a determination whether the totality of the surrounding circumstances, including the time and distance elapsed as well as the manner and extent of surveillance, are such as to convince the fact finder with reasonable certainty that any contraband which might be found in or on the vehicle at the time of search was aboard the vehicle at the time of entry into the jurisdiction of the United States. Any search by Customs officials which meets this test is properly called a 'border search'.

Id. at 382. This principle applies even if there is an interval in the surveillance by particular customs agents if, during that interval, other customs agents have the vehicle under surveillance. See Castillo-Garcia v. United States, 424 F.2d 482 (9th Cir. 1970).

However, if the surveillance is broken by an interval during which there may be a change in the condition, contents, or occupants of the vehicle from that which obtained at the border, the search may be held not to qualify as a border search. See United States v. Petersen, 473 F.2d 874, 876 (9th Cir. 1973).

Regardless of the burden Alexander places upon the government, however, one crucial factual difference in this case precludes application of the "extended border search" doctrine altogether. The Court in Alexander explained that "the primordial purpose of a search by Customs officers is not to apprehend persons, but to seize contraband property unlawfully *imported or brought into* the United States." Alexander, 362 F.2d at 382 (emphasis added). Recognizing that "it is not always advisable to make the search in the immediate vicinity of the point of border crossing," and "that the work of Customs officials is made more effective by identification of the smugglers who bring in the contraband," the Court created this doctrine. Id.; see also United States v. Espericueta Reyes, 631 F.2d 616, 619 (9th Cir. 1980) ("The right to search persons and containers at the border derives from the nation's right to control who and what may *enter* the country.") (emphasis added). In fashioning its fix around the Fourth Amendment, though, the Court spoke in the context of stopping smugglers with merchandise "*entering* the jurisdiction." Alexander, 362 F.2d at 382. One statute cited by Alexander discusses jurisdiction to search in the context of merchandise "introduced *into* the United States." Id. at 381 (citing 19 U.S.C. § 482) (emphasis added). The "introduced" language clearly signals that a bringing *into* the United States is required. In fact, the Court opined thereafter:

> In conferring upon Customs officers such broad authority, circumscribed only by Constitutional limitations of the Fourth Amendment, the Congress has in effect declared that a search which would be 'unreasonable' within the meaning of the Fourth Amendment, if

> conducted by police officers in the ordinary case, would be a reasonable search if conducted by Customs officials in lawful pursuit of *unlawful imports*.

Id. (emphasis added). BLACK'S LAW DICTIONARY defines an "import" as "[a] product brought *into* a country from a foreign country where it originated" and as "[t]he process of bringing foreign goods *into* a country." BLACK'S LAW DICTIONARY(8th ed. 2004) (emphasis added). The word "entering," used in Alexander, see 362 F.2d at 382, is defined as "to go or come in." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1984). Accordingly, this language strongly suggests that none of the underlying rationale for the "extended border search" doctrine would apply in absence of merchandise being brought *into* the United States.

Reports in Mr. Calderon-Quinonez's case, however, indicate that he was stopped en route south on Imperial Avenue. Accordingly, it cannot be said that Mr. Calderon-Quinonez was bringing merchandise *into* the United States at the time of the vehicle stop. Under the reasoning of Alexander, if he is not bringing merchandise *into* the United States at the time of the vehicle stop, there can be no governmental interest sufficient to overcome the Fourth Amendment privacy interest held by Mr. Calderon-Quinonez. Thus, in the absence of reasonable suspicion, the stop violated the Fourth Amendment.

**D. The Court Must Suppress All Evidence Obtained As A Result Of The Unconstitutional Vehicle Stop.**

The government may not use any evidence obtained in violation of the Fourth Amendment against the victim of an illegal seizure. See Weeks v. United States, 232 U.S. 383 (1914); Wong Sun v. United States, 371 U.S. 471 (1963). The exclusionary rule, moreover, extends to protect both tangible and testimonial evidence that is either the direct product of unlawful seizure or the indirect "fruits of the poisonous tree." Wong Sun, 371 U.S. at 471. "Indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality." United States v. Ladum, 141 F.3d 1328, 1336 (9th Cir. 1998), (citing New York v. Harris, 495 U.S. 14, 19 (1990)). Thus, the government may not use any physical evidence obtained from the vehicle driven by Mr. Calderon-Quinonez because the evidence stems from the unconstitutional vehicle stop. In addition, the Court should also suppress any of Mr. Calderon-Quinonez alleged statements at the time of the stop. Ladum, supra.

## III.

## THE COURT MUST SUPPRESS ALL EVIDENCE OBTAINED AS A RESULT OF THE WARRANTLESS AND UNREASONABLE SEIZURE OF MR. CALDERON-QUINONEZ IN VIOLATION OF THE FOURTH AMENDMENT

### A. The Seizure, Which Amounted to an Arrest, In This Case Violated The Fourth Amendment.

Even assuming, for the sake of argument, that the agents had reasonable suspicion to seize Mr. Calderon-Quinonez, the manner in which CBPO Ledbetter chose to seize him warranted at least a level of suspicion of at least probable cause. As he and the other inspectors and agents lacked probable cause to arrest Mr. Calderon-Quinonez, he and they violated the Fourth Amendment when CBPO Ledbetter laid out a spikestrip - "a tire deflation device" - in front of the vehicle's left front tire to stop Mr. Calderon-Quinonez's vehicle.

The United States Supreme Court has observed that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Dunaway v. New York, 442 U.S. 200, 207 n.6 (1979) (quoting Terry v. Ohio, 392 U.S. 1, 16 (1968)). See also California v. Hodari D., 499 U.S. 621, 624 (1991) ("To constitute an arrest, however--the quintessential 'seizure of the person' under our Fourth Amendment jurisprudence--the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee, was sufficient"); Brower v. County of Inyo, 489 U.S. 593, 599 (1989) ("We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place to achieve that result.").

Although the tires were not deflated in this case, preventing the car driven by Mr. Calderon-Quinonez from proceeding forward, lest it run over the spikestrip and become disabled entirely, is still no less a roadblock and show of authority designed to produce a stop by physical impact if necessary. In Brower, the police established a roadblock that crossed both lanes of a highway. The Supreme Court observed that "in marked contrast to a police car pursuing with flashing lights, or to a policeman in the road signaling an oncoming car to halt, . . . a roadblock is not just a significant show of authority to induce a voluntary stop, but is designed to produce a stop by physical impact if voluntary compliance does not occur." Brower, 489 U.S. at 598. Consequently, the police "seized" Brower for purposes of the Fourth Amendment. See also Seekamp v. Michaud, 109 F.3d 802, 806 (1st Cir. 1997) (quoting Brower, 489 U.S. at 597) (observing that

"for example, if the [Maine State Police] troopers had resorted to some other method, such as the use of spike mats, a Fourth Amendment seizure would have occurred provided Seekamp was 'stopped by the very instrumentality set in motion or put in place to achieve that result'"). Thus, a person is arrested if the physical restraint results from the government's deployment of a device (i.e., a spike strip or deflation device) that is intended and succeeds in effectively preventing a vehicle from leaving.

Accordingly, the "single, familiar standard" of probable cause is essential in determining the reasonableness of this arrest. See Dunaway, 442 U.S. at 213-214 (citing Davis v. Mississippi, 394 U.S. 721 (1969)). Probable cause, however, did not exist in this case. In support of the argument that no probable cause existed to arrest him, Mr. Calderon-Quinonez incorporates by reference his argument to the Court regarding why the facts in this case failed to give rise to the existence of any reasonable suspicion.

As a result, this arrest was unlawful and all fruits of the arrest - contraband and statements alike - must be suppressed. See Oregon v. Elstad, 470 U.S. 298 (1985) (recognizing that the "derivative fruits" exclusionary rule is driven by the need to deter unconstitutional police action that violates the Fourth Amendment); Wong Sun v. United States, 371 U.S. 471, 488 (1963). This motion should be granted as a result.

**B. In this Context as Well, the Government Must Prove the Reliability of the Narcotic Detector Dog as Well as Any Alleged Field Tests Used to Identify the Purported Substance Prior to the Stop.**

Again, the defense anticipates that the government will likely rely upon the alleged narcotic detector dog alert and supposed field tests for controlled substances conducted at the port of entry in this case to meet its burden of proving the existence of probable cause. Relying upon Cedano-Arellano, the defense re-asserts that the government must prove the reliability of the not only the narcotic detector dog, but the field test for a controlled substance that purportedly indicated the presence of cocaine as well. Absent doing so, the record fails to support a finding of probable cause to support the arrest that occurred by use of the spikestrip.

**C. The Government Cannot Rely Upon Observations Subsequent to Mr. Calderon-Quinonez's Departure from Secondary Inspection and During the "Cold Convoy" to Justify His Arrest by CBPO Ledbetter.**

This Court must conclude that the government cannot rely upon observations subsequent to Mr. Calderon-Quinonez's departure from secondary inspection and during the "cold convoy" to justify his arrest

by CBPO Ledbetter. The reason is simple and straightforward - CBPO Ledbetter did not have shared knowledge of those events prior to his decision to arrest Mr. Calderon-Quinonez. Agent Vensk's failure to relay his observations, or such failure by any other officials who participated in the "cold convoy," is fatal.

The rule in the Ninth Circuit is that at least minimal communication is required to impute knowledge between agents. The district court in United States v. Newman, 265 F. Supp. 2d 1100 (D. Ariz. 2003), analyzed the decisions in the Ninth Circuit regarding the collective knowledge rule. The Newman court noted that the decisions were somewhat confusing but that "the Ninth Circuit followed the Supreme Court's ruling in United States v. Hensley, 469 U.S. 221 (1985), requiring some minimal level of information regarding probable cause communicated among officers in order to apply the collective knowledge rule." 265 F.Supp. 2d at 1107-1108.

In United States v. Del Vizo, 918 F.2d 821 (9th Cir. 1990), and United States v. Valencia, 24 F.3d 1106 (9th Cir. 1994), the Ninth Circuit held that the collective knowledge rule applied only when there was some communication between agents. At other times the court has not stated explicitly that communication was necessary, but in each case in which probable cause or reasonable suspicion was found to exist, there was some communication between the officers. See United States v. Bernard, 623 F.2d 551 (9th Cir. 1979); Bailey v. Newland, 263 F.3d 1022 (9th Cir. 2001); United States v. Robinson, 536 F.2d 1298 (9th Cir. 1976).

The Ninth Circuit's earlier decision in Huguez v. United States, 406 F.2d 366 (9th Cir. 1968), also is helpful in this context, though it arose in the context of a search rather than arrest. In Huguez, the defendant attempted to enter the United States at the San Ysidro Port of Entry in a car that also contained a passenger. Id. at 370. After directing the car to secondary and escorting the two men to a windowless search room based upon his belief that they were under the influence of narcotics, the primary inspector ("Teela") conducted strip searches with a second inspector ("Lasher") present.[6] Id. The strip search of the two men revealed needle marks on their arms and a greasy substance on the defendant's buttocks. Id. Subsequent to this discovery, Lasher turned the two men over to two other customs agents ("Gates" and "Maxcy"). Id. Lasher informed Gates only of the needle marks discovered on the arms of the men; Teela,

---

[6] Teela observed that the eyes of the defendant and passenger appeared "glassy and pinpointed." Huguez, 406 F.2d at 370.

however, failed to say anything to either Gates or Maxcy about the greasy substance or the narcotic induced appearance of the eyes. Id.

Gates and Maxcy, thereafter, escorted the defendant and passenger to a room in the baggage area of the port so that a doctor ("Salerno") could examine them.[7] Id. at 371. Neither Gates nor Maxcy, or Lasher or Teela for that matter, "passed on to Dr. Salerno any information about the physical condition of [the defendant and passenger]." Id. Salerno also was not informed about the appearance of the eyes, the needle marks or the greasy substance on the defendant's buttocks. Id. After discovering the needle marks and the defendant's sluggish pupils, Salerno concluded that the defendant was a drug user and under the influence; without any suggestion from inspectors and in the absence of the greasy substance seen earlier by Teela, Salerno, thereafter, forcibly conducted a digital or rectal examination to determine the presence of any concealed material in the rectal cavity.[8] Id. at 371, n. 34. Salerno discovered four packets that contained heroin and which the defendant sought to have suppressed. Id. at 373. On appeal, the Court addressed whether initiation of the search was lawful under the Fourth Amendment. Id. at 377.

The Court held that while some border searches can be undertaken without probable cause, precedent dictates that "in the case of a search of body cavities, 'there must be a clear indication of the possession of narcotics,' or a 'plain suggestion' of the smuggling, which must be 'over and beyond a mere suspicion." Id. (quoting Rivas v. United States, 368 F.2d 703, 710 (9th Cir. 1966)). Pursuant to this standard, the Court concluded that Salerno's search could not be "condoned, justified or upheld as a constitutional border search." Huguez, 406 F.2d at 379. Teela's failure to relay any reasonable suspicion that he had to Gates or Maxcy rendered Salerno's belief that the defendant was carrying narcotics baseless.

> Any 'mere suspicion' that Inspector Teela had was never in any way communicated to Gates or Maxcy, and when Gates and Maxcy took Huguez and his companion from the windowless search room to the baggage area across the street where the brutal and painful intrusive rectal cavity invasion was conducted, Gates and Maxcy did not and could not have even the 'mere

---

[7] Neither Teela nor Lasher suggested to Gates that the doctor examine the defendant. Huguez, 406 F.2d at 370.

[8] The defendant was forcibly restrained by three agents atop a table and examined by Salerno in spite of his verbal protestations. Huguez, 406 F.2d at 372-73. Salerno's testimony further revealed that no emergency necessitated or justified the brutal force process involved in the intrusive rectal search. Id. at 373.

> suspicion' that Inspector Teela had, let alone any 'clear indication' or 'plain suggestion' of any cache of narcotics in Huguez's rectum . . ..
>
> Therefore Gates and Maxcy did not and could not have passed on to Dr. Salerno and Agent Spohr any information about the physical condition of Huguez and his companion that could raise the slightest real suspicion in these two other participants in the 'force process' of the intensive body cavity search.
>
> Without a search warrant, without any 'clear indication' or 'plain suggestion' that Huguez carried narcotics in his rectal cavity, and in fact without the slightest real suspicion of any such rectal cavity cache, Dr. Salerno proceeded to conduct the examination on his own initiative without any request or suggestion that he do so . . ..
>
> ***
>
> In these circumstances, the 'medical examination' degenerated into a 'force process', so aptly termed by Agent Gates, which cannot be condoned, justified or upheld as a constitutional border search. Rather, it is a brutal invasion of privacy, an illegal and frightening example of unlawful law enforcement.

Id. at 378. Accordingly, the Court held that the drugs should have been suppressed and reversed the conviction.

This Court should apply the rational set forth in Huguez and deem the warrantless arrest by CBPO Ledbetter a violation of Mr. Calderon-Quinonez's Fourth Amendment right. The Court should disregard any evidence derived from observations of Mr. Calderon-Quinonez subsequent to his departure from secondary inspection and during the "cold convoy," given an apparent failure to relay such information to CBPO Ledbetter. Only the reliability of the narcotic detector dog and alleged field test of the contents of the "package" in this case should be considered in determining the propriety of the arrest in question. Because the government failed to sustain its burden, the Court should conclude that CBPO Ledbetter in this case lacked probable cause to effect an arrest. Thus, it violated the Fourth Amendment.

**D. In this Context as Well, the Government Bears the Burden of Establishing Application of the "Extended Border Search" Doctrine to Justify the Stop and Search in this Case, Assuming Its Factual Applicability.**

The government must demonstrate whether the arrest and subsequent search in this case constituted an "extended border search." This assumes the "extended border search" doctrine identified in Alexander can be applied to Mr. Calderon-Quinonez's case given his traveling toward Mexico, as opposed to into the United States, which he does not concede for the reasons set forth above.

**E. The Court Must Suppress All Evidence Obtained As A Result Of The Unconstitutional Arrest.**

As argued above, the government may not use any evidence obtained in violation of the Fourth Amendment against the victim of an illegal seizure. See Wong Sun, 371 U.S. at 471. Thus, the Court should suppress any evidence discovered subsequent to the illegal arrest.

**IV.**

**MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS**

Defense counsel requests leave to file further motions based upon information gained in the discovery process.

**V.**

**CONCLUSION**

For these and all the foregoing reasons, the defendant, Mr. Calderon-Quinonez, respectfully requests that this court grant his motions and grant any and all other relief deemed proper and fair.

Respectfully submitted,

Dated: March 10, 2008

**JASON I. SER**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Calderon-Quinonez

C:\Documents and Settings\Jason\FDSD\Calderon-Quinones2.mtn.wpd