KAREN P. HEWITT
United States Attorney
CHRISTOPHER M. ALEXANDER
Assistant U.S. Attorney
California Bar. No. 201352
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 557-7425 /(619) 235-2757 (Fax)
Email: Christopher.M.Alexander@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LUIS CALDERON-QUINONEZ,<br><br>Defendant. | Criminal Case No. 07CR3408-BEN<br><br>HEARING DATE: May 16, 2008<br>TIME: 9:00 a.m.<br><br>UNITED STATES' RESPONSE TO DEFENDANT'S MOTIONS TO:<br><br>(1) SUPPRESS EVIDENCE DUE TO UNLAWFUL STOP;<br>(2) SUPPRESS EVIDENCE DUE TO UNLAWFUL SEIZURE OF DEFENDANT;<br>(3) SUPPRESS STATEMENTS; AND<br>(4) GRANT LEAVE TO FILE FURTHER MOTIONS.<br><br>TOGETHER WITH STATEMENT OF FACTS, MEMORANDUM OF POINTS AND AUTHORITIES |

COMES NOW the plaintiff, the UNITED STATES OF AMERICA, by and through its counsel, KAREN P. HEWITT, United States Attorney, and Christopher M. Alexander, Assistant United States Attorney, and hereby files its Response and Opposition to Defendants' above-referenced motions. This Response and Opposition is based upon the files and records of the case together with the attached statement of facts and memorandum of points and authorities.

**I**

**STATEMENT OF THE CASE**

On December 19, 2007, an Indictment was returned in the Southern District of California charging Defendant Luis Calderon-Quinonez ("Defendant") with importation of 32.54 kilograms (approximately 71.58 pounds) cocaine in violation of 21 U.S.C. §§ 952 and 960, and possession of 32.54 kilograms (approximately 71.58 pounds) cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). On December 20, 2007, the Court arraigned Defendant on the Indictment and entered a not guilty plea. The Court scheduled a motion hearing date which was continued to March 24, 2008.

On January 2, 2008, the United States filed motions for reciprocal discovery and fingerprint exemplars. On January 31, 2008, Defendant filed motions to compel discovery, dismiss, preserve evidence, and grant leave to file further motions. On March 10, 2008, Defendant filed motions to suppress evidence and grant leave to file further motions. On March 23, 2008, the United States filed a response to Defendant motions to compel discovery, preserve evidence, dismiss, and grant leave to file further motions. The United States now responds to Defendant's motions to suppress evidence and suppress statements.

**II**

**STATEMENT OF FACTS**

**A. Primary Inspection**

On December 5, 2007, at approximately 12:35 p.m., Defendant applied for admission into the United States via vehicle lane number nine at the Calexico, California, West Port of Entry ("POE"). Defendant was the driver and sole occupant of a blue 1997 Chevrolet Silverado SUV, bearing the Baja California, Mexico license plate AHV8149 (the "vehicle").

Defendant presented his DSP-150 (B1/B2 Visa) to Customs and Border Protection Officer ("CBPO") Chris Alvarado. CBPO Alvarado asked Defendant if he was bringing anything from Mexico and where he was going. Defendant gave a negative customs declaration and said he was going to Calexico to shop at Las Palmas. Defendant and the vehicle were randomly referred to secondary.

**B. Secondary Inspection**

Upon entering the secondary inspection area, Defendant presented his DSP-150 (B1/B2 Visa) and gave a negative customs declaration to CBPO Kathy Rivera. CBPO Rivera then went to request an agricultural specialist to obtain an agriculture declaration from Defendant.

Canine Enforcement Officer ("CEO") Craig Randolph screened the vehicle with his narcotic detector dog. His dog alerted to the presence of contraband concealed within the rear quarter panels. CEO Randolph informed CBPO Leslie Ledbetter of the alert.

CBPO Ledbetter then began an inspection of the vehicle. CBPO Ledbetter entered the vehicle and removed the molding and pulled the paneling away from the right rear quarter panel. CBPO Ledbetter reached inside and felt a package. He then exited the vehicle, escorted Defendant to the vehicle secondary office and conducted a pat down search which was negative for contraband.

CBPO Ledbetter returned to the vehicle to continue his inspection. CBPO Ledbetter probed the package and extracted a white powdery substance. At this time, Special Agent Russell H. Vensk Jr. arrived at the vehicle and told CBPO Ledbetter that ICE special agents were going to allow Defendant to leave the Port in the vehicle and follow him. CBPO Ledbetter then field-tested the white powdery substance and it field-tested positive for the presence of cocaine.

**C. Cold Convoy**

At approximately 1:50 p.m., Defendant, who was not informed that cocaine had been found in the vehicle, was allowed to leave the Port in the vehicle and Special Agent Vensk followed him. Defendant proceed north on Imperial Avenue and turned left (east) on 3rd St. Defendant parked the vehicle on the south side of 3rd St. west of Rockwood Ave. Defendant exited the vehicle, walked to the sidewalk on the south side of the street, faced west and yelled to somebody. It could not be determined to whom Defendant yelled. Defendant then briefly talked on his cell phone before returning to the vehicle. Defendant then proceeded east on 3rd St., turned left (north) onto Heffernan Avenue, turned

left (west) onto 4th Street, and turned right (north) onto Imperial Avenue. At 5th Street, Defendant made a u-turn and proceeded south on Imperial Avenue heading back to Mexico.

At approximately 2:00 p.m., CBPO Ledbetter saw the vehicle heading south toward the Port. CBPO Ledbetter motioned for Defendant to stop and placed a tire deflation device on front of the left front tire. CBPO Ledbetter then approached the vehicle, instructed Defendant to exit the vehicle, and placed him under arrest.

CBPO Ledbetter then completed his inspection of the vehicle. CBPO Ledbetter found and removed fourteen packages concealed within the right rear quarter panel and twelve packages concealed within the left rear quarter panel. The packages were wrapped in gray duct tape and brown postal tape. CBPO Ledbetter weighed the packages and they had a total net weight of 32.54 kilograms (approximately 71.58 pounds).

**D. <u>Defendant's Statements</u>**

On December 5, 2007, at approximately 2:40 p.m., Defendant was escorted to the Immigration & Customs Enforcement interview room at the Calexico West Port by Special Agent Vensk. At approximately 2:55 p.m., Sergeant Gonzalo Gerardo of the Calexico, California Police Department verbally advised Defendant of his constitutional rights per <u>Miranda</u> in the Spanish language, which was witnessed by Special Agent Vensk. The advisement of rights was video-recorded. Defendant was also provided an advisement of rights form in Spanish to enable him to read each right. Defendant acknowledged that he understood his rights by stating "si" after each right was read and then placing his initials next to each right on the advisement of rights form. Defendant invoked his right to remain silent. The interview was terminated.

A CBPO advised Defendant in the Spanish language of his right to have the Mexican consul informed o f his arrest. Defendant declined.

## III

## <u>THE STOP OF DEFENDANT'S VEHICLE WAS VALID</u>

Defendant asserts that the stop of the vehicle and later search were in violation of the Fourth Amendment. To support this assertion, he states the following: (1) the stop was not supported by

reasonable suspicion; (2) the United States must establish the reliability of the field test and narcotics detector dog; and (3) the United States must prove the extended border search doctrine applies.

Even if the extended border search doctrine was inapplicable, Defendant's stop and search would still be valid for a variety of reasons. First, the initial search at the POE was proper. This search, which resulted in the discovery of a white powdery substance hidden in a non-factory compartment, created probable cause to stop Defendant, search the vehicle, and arrest Defendant. The United States is not relying on the following to support reasonable suspicion or probable cause: (1) the dog alert; and (2) the positive result of the field test. See United States v. Cedano-Arellano, 332 F.3d 568, 573-74 (9th Cir. 2003) (discussing dog alerts); United States v. Lingenfelter, 997 F.2d 632, 639 (9th Cir. 1993) (holding that "[a] canine sniff alone can supply the probable cause" if the dog is reliable); United States v. Okafor, 285 F.3d 842, 846 (9th Cir. 2002) (discussing X-rays).

Defendant's assertions that there was no reasonable suspicion for the stop of his vehicle or probable cause for the search of his vehicle simply do not have merit. The CBPO's observations at the POE (and Defendant's apparent flight back toward Mexico) gave rise to probable cause to stop Defendant, search Defendant's vehicle, and arrest Defendant. Additionally, under the collective knowledge doctrine, Defendant's actions in the United States support probable cause as well.

Second, Defendant was headed back to Mexico. In other words, he was back at the border where no suspicion was necessary for the search. Finally, Defendant's stop, search, and arrest were proper under the extended border search doctrine.

Defendant also requests an evidentiary hearing. The Court should not grant this request. "An evidentiary hearing on a motion to suppress need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist." United States v. Howell, 231 F.3d 615, 620 (9th Cir. 2000) (citations omitted); see also United States v. Carrion, 463 F.2d 704, 706 (9th Cir. 1972) (addressing search and seizure motions); United States v. Walczak, 783 F.2d 852, 857 (9th Cir. 1986) (addressing suppress of evidence motions); cf. United States v. Wardlow, 951 F.2d 1115, 1116 (9th Cir. 1991) ("A broad declaration signed by counsel rather than an individual competent to testify concerning the facts is not sufficient to meet the

requirements of [Central District local] rule 9.2."). Defendant has submitted no evidence contesting anything in the Statement of Facts attached to the Complaint.

**A. The Initial Border Search Was Proper**

It is well-settled that routine searches at the United States international border require no objective justification, probable cause, or warrant. See, e.g., United States v. Flores-Montano, 541 U.S. 149, 155 (2004); United States v. Montoya de Hernandez, 473 U.S. 531, 538 (1985). "That searches made at the border, pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border, should, by now, require no extended demonstration." United States v. Ramsey, 431 U.S. 606, 616 (1977). "Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant." Montoya de Hernandez, 473 U.S. at 538. No level of suspicion is required for a border search, and even random searches are constitutional. United States v. Sandoval Vargas, 854 F.2d 1132, 1133-34 (9th Cir. 1988).

**B. The Border Search Created Reasonable Suspicion and Probable Cause for the Stop**

The level of suspicion necessary for "reasonable suspicion" cannot be quantified. It is not "readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). The concept of reasonable suspicion is somewhat abstract. United States v. Arvizu, 534 U.S. 266, 274 (2002). Other "levels" of suspicion or proof, however, offer needed guidance. "A preponderance of the evidence" is "more likely than not"—or, put differently, 50% plus. "Probable cause" is a lesser standard then preponderance of the evidence. Texas v. Brown, 460 U.S. 730, 742 (1983). Finally, "reasonable suspicion" is an even less demanding standard than probable cause and requires a showing considerably less than a preponderance of the evidence. Illinois v. Wardlow, 528 U.S. 119, 123 (2000). Reasonable suspicion requires a minimal level of objective justification for making the stop. Id. As stated by the Supreme Court in Arvizu, 534 U.S. at 274, "Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of evidence standard" (citations omitted).

Under the Fourth Amendment, a warrantless arrest requires probable cause. See Michigan v. Summers, 452 U.S. 692, 700 (1981). Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested. Beck v. Ohio, 379 U.S. 89, 91 (1964). Alternatively, the Ninth Circuit has defined probable cause as follows: when "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime." United States v. Smith, 790 F.2d 789, 792 (9th Cir. 1986). The Supreme Court has cautioned that probable cause "does not demand any showing that such a belief be correct or more likely true than false." Texas v. Brown, 460 U.S. 730, 742 (1983). While conclusive evidence of guilt is of course not necessary under this standard to establish probable cause, "[m]ere suspicion, common rumor, or even strong reason to suspect are not enough." McKenzie v. Lamb, 738 F.2d 1005, 1008 (9th Cir. 1984) (citing Henry v. United States, 361 U.S. 98, 101 (1959)).

Probable cause is an objective standard. The arresting officers' subjective intention is immaterial in judging whether their actions were reasonable for Fourth Amendment purposes. See Devenpeck v. Alford, 543 U.S. 146, 153 ("Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause . . . . [H]is subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." (citations omitted)); Whren v. United States, 517 U.S. 806, 814 (1996). Generally, "an officer need not have probable cause for every element of the offense." Gasho v. United States, 39 F.3d 1420, 1428 (9th Cir. 1994). However, "when specific intent is a required element of the offense, the arresting officer must have probable cause for that element in order to reasonably believe that a crime has occurred." Id.

It appears that, in Defendant's mind, there can be no probable cause until the substance is known to be a controlled substance. This level of certainty is not required to support probable cause. There can be no doubt that finding the hidden package containing the white powdery substance in the vehicle driven by Defendant and occupied by only him constituted probable cause to arrest him. See, e.g., United States v. Buckner, 179 F.3d 834 (9th Cir. 1999) (discovery of drugs in vehicle at international

border sufficient to justify arrest of passenger); see also United States v. Garcia, 205 F.3d 1182, 1186-87 (9th Cir. 2000) (holding that probable cause existed where the police officer located "a plastic baggie sticking out from between the tissues" in the defendant's possession which later proved to be methamphetamine); United States v. Hudson, 100 F.3d 1409, 1420 (9th Cir. 1996) (holding that there was probable cause to associate a substance believed to be methamphetamine with criminal activity); United States v. Garcia-Rodriguez, 558 F.2d 956, 964-65 (9th Cir. 1977) (noting that "the observation of what apparently is contraband material in plain view within a vehicle would also give rise to probable cause for a search. Here, there was testimony which, if believed, established both the sighting and smell of the marijuana during a valid investigatory stop.").

The essential elements of a violation of 21 U.S.C. §§ 952 and 960 are: (1) the defendant intentionally brought marijuana into the United States; and (2) the defendant knew that it was marijuana or some other prohibited drug. See 9th Cir. Crim. Jury Instr. 9.27 (2006). The essential elements of a violation of 21 U.S.C. § 841(a)(1) are: (1) the defendant knowingly possessed marijuana in a measurable or detectable amount; and (2) the Defendant possessed it with the intent to deliver it to another person. See 9th Cir. Crim. Jury Instr. 9.15 (2006). The elements of a violation of the smuggling law are: "(1) defendant fraudulently or knowingly, (2) imported or brought into the United States, (3) any merchandise, (4) contrary to law." United States v. Patel, 762 F.2d 784, 790 (9th Cir. 1985); see 18 U.S.C. § 545. There was probable cause for every element of these offenses. Thus, after the substance was discovered, CBPO Ledbetter had probable cause to arrest Defendant.

**C. The Stop Was Proper Since Defendant Was at the Border Heading Southbound**

"[A] person leaving the United States may be stopped and searched, without probable cause or any suspicion, pursuant to border search principles." United States v. Duncan, 693 F.2d 971, 977 (9th Cir. 1982) (citing United States v. Stanley, 545 F.2d 661 (9th Cir. 1976)).

Defendant was headed back to Mexico. Officer Ledbetter stopped the vehicle before it returned to Mexico and completed his search of it at the POE. Officer Ledbetter did not need probable cause or reasonable suspicion to stop and search Defendant prior to his traveling back into Mexico. Officer Ledbetter searched Defendant's vehicle and found packages containing cocaine concealed within the vehicle weighing approximately 32.54 kilograms.

**D. Defendant's Actions At and Away From the POE Supports Probable Cause**

Defendant also argues that the Court cannot take into account the observations made by Agent Vensk since there is no evidence that Agent Vensk communicated his observations to Officer Ledbetter. The Ninth Circuit has not announced such a rule. See United States v. Ramirez, 473 F.3d 1026 (9th Cir. 2007) (noting that "we have applied the collective knowledge doctrine 'regardless of whether [any] information [giving rise to probable cause] was actually communicated to' the officer conducting the stop, search, or arrest."). Rather, under the collective knowledge doctrine, the Ninth Circuit has held that district courts must determine whether an investigatory stop, search, or arrest complied with the Fourth Amendment by "look[ing] to the collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually [undertakes the challenged action]." United States v. Sutton, 794 F.2d 1415, 1426 (9th Cir. 1986); see also United States v. Michael R., 90 F.3d 340, 346 (9th Cir. 1996) (noting that the term "trained officer's experience" includes the "collective knowledge of the officers involved …") (citation omitted). Permissible deductions and rational inferences drawn from officers' experience, training, and expertise form a part of this "collective knowledge," as long as rooted in "objective facts" and as long as amenable to "rational explanation." Michael R., 90 F.3d at 346.

At the time Defendant was stopped returning to Mexico, Officer Ledbetter had already found the hidden package containing the white powdery substance. After spending approximately 10 minutes in the United States, Defendant was headed back to Mexico.

Additionally, under the collective knowledge doctrine, probable cause existed due to his actions in the United States observed by CBPO Alvarado and Special Agent Vensk. In primary inspection, Defendant claimed to be going shopping in Calexico at Las Palmas. After leaving the POE, Defendant proceed north on Imperial Avenue and turned left (east) on 3rd St. Defendant parked the vehicle on the south side of 3rd St. west of Rockwood Ave. Defendant exited the vehicle, walked to the sidewalk on the south side of the street, faced west and yelled to somebody. It could not be determined to whom Defendant yelled. Defendant then briefly talked on his cell phone before returning to the vehicle. Defendant then proceeded east on 3rd St., turned left (north) onto Heffernan Avenue, turned left (west)

onto 4th Street, and turned right (north) onto Imperial Avenue. At 5th Street, Defendant made a u-turn and proceeded south on Imperial Avenue, in an attempt to abscond into Mexico. These actions also support probable cause to stop and search the vehicle.

**E. The Stop Was Proper Since Defendant Was Subject to an Extended Border Search**

Contrary to Defendant's arguments, the stop and search of Defendant's vehicle was a valid extended border search which requires no probable cause.

Some stops and searches, though not at the border, occur so spatially and temporally close to it that they are considered border searches. See United States v. Ogbuehi, 18 F.3d 807, 812-13 (9th Cir. 1994) (citing United States v. Cardona, 769 F.2d 625, 628 (9th Cir. 1985)); see also United States v. Espericueta-Reyes, 631 F.2d 616, 619-21 (9th Cir. 1980). "The fact that some search occurred at the time of the initial border crossing simply does not prevent later searches from coming under the rules of border searches." United States v. Alfonso, 759 F.2d 728, 735 (9th Cir. 1985); see United States v. Ogueri, 798 F.2d 452, 453 (11th Cir. 1986) (holding that a second customs search conducted 20 yards beyond customs enclosure was valid as search at functional equivalent of border); United States v. Ramos, 645 F.2d 318, 320-21 (5th Cir. Unit B 1981) (holding that a second customs search conducted in airport lobby 30 minutes after leaving customs enclosure and after checking into hotel still valid as search at functional equivalent of border); United States v. Mejias, 452 F.2d 1190, 1193 n.1 (9th Cir. 1971) ("The term 'border' logically includes the check point at the point of entry as well as a reasonable extended geographic area in the immediate vicinity of any entry point.").

In Espericueta-Reyes, agents received a tip from an informant that a certain vehicle containing contraband would cross the border at the San Luis, Arizona Port of Entry ("POE"). 631 F.2d at 619-21. Upon crossing the border, the vehicle was searched by customs officials and then placed under surveillance. Id. The vehicle was then stopped about a mile from the POE. Id. Agents took the vehicle and its occupants back to the POE for a more thorough search. Id. This search, conducted at the POE, uncovered heroin concealed in the right rear wheel well. Id. The defendants moved to suppress evidence obtained in the search. Id. The district court denied the defendants' motion. Id. The Ninth Circuit affirmed holding that the subsequent search of the vehicle was a valid extended border search since it took place within 1 1/2 hours of the crossing and it was within the general border area. Id.

Further, the appellate court stated that searches made at the time of the initial border crossing as well as searches which qualify as extended border searches need not be supported by probable cause. Id.

Here, Agent Vensk and others set up surveillance at the Calexico West POE. At approximately 1:50 p.m., the Agents allowed Defendant to leave the POE. The Agents followed the vehicle from the POE. The Agents observed Defendant park the vehicle for a short time, yell at somebody, and talk on his cellular telephone. Defendant then got back into his vehicle and headed back toward Mexico. Officer Ledbetter stopped the vehicle and completed his search at the POE. Officer Ledbetter searched Defendant's vehicle and found packages containing cocaine concealed within the vehicle weighing approximately 32.54 kilograms. Because Defendant's vehicle was followed from the border, stopped spatially and temporally close to the border, and returned to the inspection area at the POE to be searched, there can be no doubt that this was an extended border search requiring no probable cause to search the vehicle.

## IV

## THE EVIDENCE OBTAINED IN THIS CASE SHOULD NOT BE SUPPRESSED

Defendant moves to suppress all evidence due to an unlawful seizure. As noted previously, there was probable cause to stop Defendant, search the vehicle, and arrest Defendant. The probable cause in this case allowed for the warrantless search of the vehicle under two separate doctrines: (1) the automobile exception; and (2) the inventory search exception. Even if there was no probable cause to seize Defendant, the evidence obtained in this case should still be admissible.

### A. The Automobile Exception

The "automobile exception" is a long-established exception to the Fourth Amendment's warrant requirement. The Supreme Court has applied an automobile exception to the warrant requirement, based on the inherent mobility of and reduced expectation of privacy in automobiles, for almost eighty years. See Carroll v. United States, 267 U.S. 132, 153 (1925). Over the years, the Court has explained the scope of this exception.

In United States v. Ross, 456 U.S. 798, 799 (1982), the Supreme Court addressed the permissible scope of searches allowed under the automobile exception. Such searches must be supported by probable cause. "In this class of cases, a search is not unreasonable if based on facts that would justify

the issuance of a warrant, even though a warrant has not actually been obtained." Id. at 809. As to the scope of the search, the Ross decision held that "the scope of the warrantless search authorized by [the automobile] exception is no broader and no narrower than a magistrate could legitimately authorize by warrant. If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." Id. at 825.

In Pennsylvania v. Labron, 518 U.S. 938, 940 (1996), the Supreme Court noted the rationale for the automobile exception is twofold: (1) the ready mobility of the automobile; and (2) the individual's reduced expectation of privacy in an automobile, owing to its pervasive regulation. Thus, the Court restated the automobile exception as "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more." Id. at 941 (citation omitted); Maryland v. Dyson, 527 U.S. 465, 467 (1999) (same).

Here, the search of Defendant's vehicle comported with the two requirements necessary for a valid automobile search. First, as to the ready mobility of a vehicle, the Supreme Court has noted that "the justification to conduct such a warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant." Michigan v. Thomas, 458 U.S. 259, 261 (1982); see also California v. Carney, 471 U.S. 386, 392-93 (1985) ("When a vehicle is being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes--temporary or otherwise--the two justifications for the vehicle exception come into play.").

Underscoring this point, the Ninth Circuit rejected the contention that the automobile exception did not apply to an impounded car, because the impounding of the vehicle made it no longer "readily mobile." See United States v. Garcia, 205 F.3d 1182, 1187-88 (9th Cir. 2000). Instead, both the Supreme Court and the Ninth Circuit have elicited certain factors to evaluate whether a vehicle is "readily mobile" under the automobile exception. In California v. Carney, 471 U.S. 386, 394 (1985), where the Court applied the automobile exception to motor homes, the Court noted, "[a]mong the factors that might be relevant in determining whether a warrant would be required in such a circumstance is its

location, whether the vehicle is readily mobile or instead, for instance, elevated on blocks, whether the vehicle is licensed, whether it is connected to utilities, and whether it has convenient access to a public road." See also United States v. Hatley, 15 F.3d 856, 859 (9th Cir. 1994); United States v. Hamilton, 792 F.2d 837, 842 (9th Cir. 1986); accord United States v. Ludwig, 10 F.3d 1523, 1528 (10th Cir. 1993) (permitting warrantless search of automobile even if defendant unlikely to drive away because police had probable cause to believe automobile contained contraband).

Here, the vehicle was mobile. It was traveling southbound back to Mexico. The vehicle was on a public road and free from any physical hindrances to its being moved by anyone, when the search was conducted. Although Defendant was outside of the vehicle, there was nothing about the vehicle that made it immobile.

Second, there was probable cause to believe that the vehicle contained evidence of a crime: narcotics or merchandise imported contrary to law. As indicated above, CBPO Ledbetter felt a package inside a space in the vehicle. The package was probed and contained a white powdery substance. Since Defendant did not have a opportunity to dispose of the items in his vehicle after leaving the POE and prior to heading back to Mexico, it was reasonable for CBPO Ledbetter to believe that narcotics or undeclared merchandise would be found in the vehicle. Thus, the search of the vehicle properly fell under the automobile exception as the vehicle was mobile and there was probable cause to believe that further evidence of the crimes would be found in the vehicle.

**B. Inventory Search Exception**

Even assuming the search of Defendant's vehicle was conducted illegally, the Ninth Circuit has previously held that if a legal inventory search of a vehicle was inevitable, the discovery of evidence during that illegal search is still admissible. United States v. Andrade, 784 F.2d 1431, 1433 (9th Cir. 1986) (holding that the cocaine was admissible even if the search incident to arrest was unlawful); United States v. Finnegan, 568 F. 2d 637, 642 n.5 (9th Cir. 1977); see also United States v. Mancera-Londono, 912 F.2d 373, 375-76 (9th Cir. 1990).

"To be valid, an inventory search must conform to a standardized and established local procedure, and must be motivated by a 'concern to inventory [the items] rather than to search for other incriminating evidence.'" United States v. Bowhay, 992 F.2d 229, 230 (9th Cir. 1993) (quoting United

States v. Feldman, 788 F.2d 544, 550-551 (9th Cir. 1986)). We are told there are "three rationales for an inventory search: to protect the owner's property in police custody; to protect the police against claims for lost property; and to protect the police and community from potential danger." Feldman, 788 F.2d at 550-51. For example, in Feldman, the Ninth Circuit held that an inventory search of car done in violation of police policies was lawful because the officer reasonably suspected that car contained a gun and search was reasonable to ensure the immediate protection of the public's safety. See id. at 553.

As the Supreme Court held in Florida v. White, 526 U.S. 559, 563-64 (1999), an automobile, due to its mobility, may be seized for forfeiture without a warrant.

Here, the vehicle was seized as evidence in a crime (i.e., narcotics or merchandise imported contrary to law). CBPO Ledbetter continued his search of the vehicle taking an inventory of the previously found packages. CBPO Ledbetter inventoried the contents of the vehicle in the normal course of the investigation which included the seizure of forfeitable property that may constitute the proceeds of illegal drug activity. The contents of the vehicle were inventoried during the normal established procedure to protect the agency from claims for lost property. The controlled substance in the vehicle would have therefore been discovered.

**C. Inevitable Discovery Exception**

The Supreme Court has developed three exceptions to the "fruit of the poisonous tree" doctrine which allow the admission of evidence derived from official misconduct. These three exceptions are the "independent source" exception, the "attenuated basis" exception, and the "inevitable discovery" exception.

Under the inevitable discovery exception, evidence need not be suppressed if it was obtained in a manner that is causally unrelated to an illegal search or seizure. See Nix v. Williams, 467 U.S. 431 (1984); United States v. Ramirez-Sandoval, 872 F.2d 1392, 1396 (9th Cir. 1989) (stating that the inevitable discovery doctrine "allows the introduction of illegally obtained evidence if the government can show by a preponderance of the evidence that the tainted evidence would inevitably have been discovered through lawful means").

Here, assuming that Defendant had not been detained and had continued into Mexico, the vehicle would still have been searched. Thus, the drugs would have been discovered eventually.

**D. Defendant's Statements Were Not Tainted by the Search**

Even if the seizure was illegal, Defendant's statements should not be suppressed because intervening events purged the taint. For example, the Ninth Circuit has held "that even if the arrest of [the defendant] on August 4 was illegal, intervening events purged the initial taint of illegality, and that [the defendant's] confession was not obtained in violation of the fourth amendment." United States v. Manuel, 706 F.2d 908, 911 (9th Cir. 1983) (noting that "the police accumulated more than enough evidence to justify the [defendant's] arrest and detention."). Assuming CBPO Alvarado and Agent Vensk's observations may not support probable cause under the collective knowledge doctrine, these observations cure the taint of any illegality. Collectively, CBPO Ledbetter, CBPO Alvarado, and Agent Vensk's observations constitute probable cause. This additional evidence justifies Defendant's seizure.

**V**

**DEFENDANT'S MOTION TO SUPPRESS STATEMENTS SHOULD BE DENIED**

Defendant moves to suppress his statements since they exceed routine booking questions and questioning occurred before Defendant waived his Miranda rights.

**A. Routine Booking Information**

Upon arresting Defendant, Agents asked Defendant routine booking questions for the purpose of obtaining background biographical information for filling out a personal history report and a booking slip. "Routine gathering of background biographical data does not constitute interrogation sufficient to trigger constitutional protections." United States v. Perez, 776 F.2d 797, 799 (9th Cir. 1985); see also Pennsylvania v. Muniz, 496 U.S. 582, 601-04 (1990) (even if incriminating, answers elicited prior to Miranda warnings during procedures "necessarily attendant to the police procedure [are] held by the court to be legitimate" and admissible). Thus, Defendant's responses to the Agents' booking questions therefore should be admitted.

Specifically, Defendant's responses to whether he was under the influence is consistent with routine booking questions. First, the Agents must know if Defendant will need medical treatment. Second, prior to obtaining a waiver of his Miranda rights, the Agents need to be assured that his a

statement is voluntary. United States v. Kelley, 953 F.2d 562, 565 (9th Cir. 1992) (holding that "[a] statement may not be admitted if because of mental illness, drugs, or intoxication, the statement was not the product of a rational intellect and a free will."); United States v. George, 987 F.2d 1428, 1430-31 (9th Cir. 1993) (holding that "a defendant can voluntarily waive his Miranda rights even when he is in the hospital, on medication, and in pain."); United States v. Lewis, 833 F.2d 1380, 1384-85 (9th Cir. 1987) (holding statement voluntary despite fact that defendant had recently returned from surgery on her shoulder, was in pain, and had recently received a general anesthetic); United States v. Martin, 781 F.2d 671, 673-74 (9th Cir. 1985) (holding statements voluntary even though defendant under the influence of Demerol, a pain killer, and still in pain). These questions are the same questions the Court asks in a Rule 11 colloquy to determine voluntariness. See United States v. Timbana, 222 F.3d 688, 705 (9th Cir. 2000). Does the Court violate Miranda during a Rule 11 colloquy in which a defendant is asked about prior drug usage? Defendant's suggestion that these questions should be asked after a Miranda waiver put the cart before the horse. The Court should find that the Agents' questions do not violate Miranda.

**B. Defendant's Statements Were Not Tainted by the Search**

In Miranda v. Arizona, 396 U.S. 868 (1969), the Supreme Court held that under the Fourth Amendment a person must be advised of his rights prior to incriminating questioning after custodial arrest. Defendant's statements were not obtained in violation of Miranda since Defendant was not subjected to incriminating questioning while in custody. The questions that the Agents asked were clarifying questions.

To determine whether questioning is "interrogation" within the meaning of Miranda, a court looks to whether "under all of the circumstances involved in a given case, the questions are reasonably likely to elicit an incriminating response from the suspect." United States v. Salgado, 292 F.3d 1169, 1172 (9th Cir. 2002) (internal quotations and citations omitted). After being advised of his Miranda rights, Defendant did not remain silent. Rather, he kept talking. He either provided unintelligible responses or unsolicited responses to the Agents' clarifying questions.

The Ninth Circuit recently held that "[p]rior to obtaining an unambiguous and unequivocal waiver, a duty rests with the interrogating officer to clarify any ambiguity before beginning general

interrogation." See United States v. Rodriguez, 518 F.3d 1072, 1080 (9th Cir. 2008); United States v. Lopez-Diaz, 630 F.2d 661, 665 (9th Cir. 1980) (noting that "[t]here is a critical distinction between, on the one hand, an inquiry for the limited purpose of clarifying whether the defendant is invoking his right to remain silent or has changed his mind regarding an earlier assertion of the right and, on the other hand, questioning aimed at eliciting incriminating statements concerning the very subject on which the defendant has invoked his right.").

The Agents asked Defendant if he wanted to talk about why he was under arrest. First, Defendant says, "No" that he does not want to talk. Then, he continues to talk and denies knowledge of the why he is in custody. The Agents ask a clarifying question. Defendant then provides a conflicting response and asks a question. The Agents answer his question and ask if he understands. Defendant then denies knowledge. The Agents clarify his denial. Defendant responds by explaining that he just bought the truck, he has crossed lots of times, and he has been to secondary twice. The Agents again seek to get a definitive yes or no from Defendant. Defendant again denies knowledge. The Agents try once more to get a definitive yes or no from Defendant. Defendant again denies knowledge. Although Defendant's responses have been ambiguous, the Agents stop questioning Defendant.

As a result, Defendant's alleged invocations were, at best, ambiguous. See Anderson v. Terhune, 467 F.3d 1208, 1211-12 (9th Cir. 2006) ("'If the suspect's statement is not unambiguous or unequivocal . . . the officers have no obligation to stop questioning.'"); United States v. Washington, 462 F.3d 1124, 1134 (9th Cir. 2006) ("A person waives the right to remain silent if, after being informed of that right, the person does not invoke that right."). Washington cited United States v. Thierman, 678 F.2d 1331, 1335-36 (9th Cir. 1982) which held that the defendant did not invoke right to remain silent when he asked, "Can we talk about it tomorrow?" Washington, 462 F.3d at 1134.

Finally, given that there was a recording of Defendant's post-arrest statements, an evidentiary hearing is unnecessary.

/ / /

/ / /

/ / /

## VI

## DEFENDANT'S MOTION FOR LEAVE TO FILE FURTHER MOTIONS

Defendant's motion for leave to file further motions should be denied except to the extent that such motions are based on new discovery.

## VII

## CONCLUSION

For the foregoing reasons, the United States asks that the Court deny Defendant's motions, except where unopposed, limit further motions to those based on new law or facts.

DATED: May 14, 2008

Respectfully submitted,

KAREN P. HEWITT
United States Attorney

*s/Christopher M. Alexander*
CHRISTOPHER M. ALEXANADER
Assistant United States Attorney
Attorneys for Plaintiff
United States of America
Email: Christopher.M.Alexander@usdoj.gov

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>LUIS CALDERON-QUINONEZ,<br>Defendant. | Criminal Case No. 07CR3408-BEN<br><br>**CERTIFICATE OF SERVICE** |

IT IS HEREBY CERTIFIED THAT:

I, CHRISTOPHER ALEXANDER, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of United States' Response and Opposition to Defendant's Motions to (1) compel discovery/preserve evidence; (2) dismiss; (3) suppress evidence; and (4) grant leave to file further motions, together with memorandum of points and authorities on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

1. Jason Ser, Esq.
   Atty for Defendant

I hereby certify that I have caused to be mailed the foregoing, by the United States Postal Service, to the following non-ECF participants on this case:

None

the last known address, at which place there is delivery service of mail from the United States Postal Service.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 14, 2008.

*s/Christopher M. Alexander*
CHRISTOPHER M. ALEXANDER